# CHARLESTON.

GEORGE, ADM'R, *v.* CRIM *et al.*

Submitted January 19, 1909. Decided December 7, 1909.

1. SUBROGATION—*Rights of Surety.*

   A surety, on the payment by him of a judgment constituting a lien on the property of his principal, is entitled in equity, without an assignment thereof, to be subrogated to all the rights, powers and remedies of the judgment creditor, for the enforcement of the lien against property of the principal debtor for his own benefit. (p. 429).

2. JUDGMENT—*Lien—Merger.*

   Though, in law, a judgment lien, or other incumbrance on

property, is merged in the legal title to the property by the purchase of the same by the creditor and ceases to exist, it is otherwise in equity, if the interest and just rights of the parties require the lien to be kept alive; and, in such cases, equity will regard it as still subsisting and enforce it by means of subrogation or otherwise for the protection of the purchaser. (p. 430).

3. PRINCIPAL AND SURETY—*Discharge of Surety.*

Purchase by a judgment creditor of property on which the judgment is a lien does not release a surety in the judgment, if the property. so purchased was encumbered by prior liens in favor of the purchaser to the extent of the full value thereof. (p. 431).

4. SAME—*Rights of Surety—Creditor's Rights.*

A judgment creditor, having a number of judgments against the debtor, in some of which there are sureties, may pursue his remedies by execution and otherwise for the collection of the judgments in which there are no sureties, without violation of any duty to the latter, provided he has not been in any way required by them to proceed to collect the judgments for which they are liable, and, if property be taken on execution on such other judgments and released, or the executions be returned unsatisfied, the issuance, levying and return of the same, neither release the sureties in such other judgments, nor work a discharge or satisfaction of the judgments on which they were issued, so as to give priority to' such others in favor of the sureties. (p. 432).

5. VENDOR AND PURCHASER—*Bona Fide Purchasers—Notice.*

A surety's right of subrogation is an equity, not always disclosed by the judgment, and persons having no knowledge thereof may deal with the property on which the judgment is a lien as if such right did not exist. (p. 433).

6. SAME—*Notice of Claim—Effect.*

A purchaser of property, with notice of a right in a surety to charge the same, by way of subrogation, takes it subject to such equitable right. (p. 433).

7. WITNESSES—*Competency—Transactions With Decedent.*

In a suit by a surety, to enforce the lien of a judgment against land of the principal debtor, conveyed to the judgment creditor, and contribution from his co-sureties, after the death of the principal debtor and the judgment creditor, such co-sureties are not competent witnesses to prove the relation of suretyship. (p. 434).

8. PLEADING—*Denial—Objections—Waiver.*

In the absence of an exception for generality, a general, informal and indefinite denial of a material allegation in an answer is sufficient. (p. 429).

Appeal from Circuit Court, Barbour County.

Action by R. T. George, administrator of Allen V. Wilmoth, against J. N. B. Crim and others. From the decree, defendants E. H. Crim and Melville Peck appeal.

Affirmed in part. Reversed in part. Remanded.

W. T. Ice, Jr., for appellants.

W. T. George, for appellee.

POFFENBARGER, JUDGE:

A decree of the circuit court of Barbour county, pronounced on the bill of R. T. George, administrator of Allen V. Wilmoth, against J. N. B. Crim and others, praying, among other things, subrogation of the estate of plaintiff's decedent to the benefit of judgment liens on a certain tract of land, conveyed by the debtor to Crim, in satisfaction of certain other liens, pending a suit by said Crim against the debtor, one John Howell, having conditionally set aside said deed to the extent of said alleged lien, adjudged the land liable therefor in the hands of E. H. Crim and Melville Peck, vendees of said J. N. B. Crim, and referred the cause to a commissioner, the said E. H. Crim and Peck have appealed.

The facts and proceedings involved have furnished the basis of some three or four suits, the records of all of which have been brought together in this cause by reference, adoption, consolidation and otherwise. One of these was instituted by J. N. B. Crim against John Howell in 1887 to enforce the liens of several judgments, recovered by the former against the latter, among which were the following: One for $979.39, rendered June 19, 1876, one for $992.13, rendered Apr. 9, 1877, one for $655.59, rendered May 24, 1899, and one for $3,090.00, rendered Dec. 17, 1883. There never was a final decree in this cause. The second suit was brought by Geo. A. Lough against said Howell, in 1889, for rescission of a contract of sale of 30 acres of land by the latter to the former, carried into conveyance. As consideration for this land, Lough had paid Howell $350.00 and executed his notes for the residue of purchase money, amounting to $550.00, secured by a vendor's lien. Finding the land encumbered by judgments in favor of Crim and others, he refused to pay any part of the notes,

sought rescission and a decree for the money he had paid. No final decree was ever rendered in that cause. In January, 1897, Crim brought another suit for the purpose of enforcing the liens of three judgments, owned by him, against lands belonging to Allen V. Wilmoth. The first of these was against John Howell and Wilmoth, recovered by S. L. O'Neal, Feb. 18, 1892, and assigned to Crim; the second was against Howell, Wilmoth and B. L. and G. W. Dilworth, recovered by James Nutter, May 26, 1892, and assigned to Crim; and the third was against Howell and Wilmoth, recovered Feb. 4, 1893, by Crim. These judgments were for $133.71, $1,036.60 and $324.00, respectively, and costs. Before Crim brought this suit, the Dilworths had paid $500.00 on the second judgment, and, pending the suit, Wilmoth paid the balance of it and all of the other two, and the suit was thereupon dismissed. In April, 1899, John Howell filed his petition in voluntary bankruptcy in the district court of the United States for the Northern District of West Virginia, and, later, on proof of debts and liens, determination of priorities of lien, sale of his lands by the trustee in bankruptcy and distribution of the funds among the creditors, the proceedings on said petition were closed.

Howell had dealt very extensively in land, and purchased largely on credit and contracted a vast amount of indebtedness, which was reduced to judgments and held mainly by J. N. B. Crim. The record in the cause of *Crim* v. *Howell* shows Crim had owned more than twenty judgments against Howell and Howell and others. Some of these had been released, but the amounts remaining unsatisfied and unreleased were large. The report of the appraisers in the bankruptcy proceeding indicates Howell's ownership of eleven tracts of land in Barbour county and two in Randolph county, valued at about $17,500.00. They were sold in said proceeding for $12,205.00. By the referee's report in that proceeding, it appears that Crim proved lien indebtedness, amounting to $14,857.80, and the representatives of the estate of Samuel Woods, deceased, such indebtedness amounting to $1,762.85. The Crim judgments, held by recovery and assignment from others, range in date from June 19, 1876, to August 14, 1893, and in amounts from slightly over $100.00 up to more than $4,000.00.

In general such were the conditions under which R. T. George, as administrator of Wilmoth, filed his bill in this cause at January Rules, 1904, claiming right of subrogation in respect to the judgments paid by his decedent, originally constituting liens, subsequent to some of those of Crim, on several tracts of land and the coal, oil and gas in other tracts, conveyed by Howell and wife to A. B. Brown,· Albert Brown and Geo. W. Gall, Jr., by deed, dated July 5, 1892, in consideration of $17,000.00, while the suit instituted by Crim against Howell, was pending, and another tract of land, containing 327 acres and 20 poles, conveyed by Howell and wife to J. N. B. Crim himself, while said suit was pending, (Feb. 11, 1896), in consideration of .$6,743.38, satisfied, as to all but $1,460.12 thereof, by the cancellation and release of certain judgment liens, held by Crim, the said residue of $1,460.12 having been applied in satisfaction of a prior vendor's lien on the land in favor of one Lewis Wilson. By this sale three of Crim's judgments, those of June 19, 1876, April 9, 1877, and May 24, 1879, were wholly satisfied, and another, that of Dec. 17, 1883, partially. These and a number of others were all prior to those recovered against Howell, Wilmoth and others, and substantially paid by Wilmoth. Prior to the conveyance of Feb. 11, 1896, Crim executed a release, including all of the four judgments, wholly and partially satisfied out of the proceeds of that sale, and many others, in so far as they were liens upon the lands conveyed to A. B. Brown, Albert Brown and G. W. Gall, Jr., by deed dated July 5, 1892. These judgments, as rendered, aggregated about $24,000.00, but they were not wholly released. Among them was one of the Wilmoth judgments. According to the testimony of Howell, the consideration of the conveyance to the Browns and Gall consisted of $4,250.00 in cash and ten notes for $1,275.00 each, payable consecutively in ten years, all of which, save $6,566.21, used in the discharge of purchase money indebtedness and two small judgments, went into the hands of Crim on account of Howell's indebtedness to him. Crim seems to have executed a paper, on January 16, 1894, reciting payment and satisfaction of several small judgments, by assignment of purchase money notes, given to Howell by the Browns and Gall. These judgments · aggregate about $4,-500.00 and range in date from November 27, 1887, to July

18, 1891, and in amount from about $100.00 to about $500.00. From time to time, beginning on the 19th day of June, 1879, Crim had taken out a number of executions against Howell, one of which was on the judgment of June 19, 1876, for $979.39, which was levied on property amply sufficient to satisfy it; one on the judgment of May 24, 1879, for $655.59, which was levied on property sufficient to satisfy it; and two later ones on the same judgment which were returned unexecuted by order of the plaintiff. From the record in the case of *Crim* v. *Howell*, as well as the answer of Howell's administrator in this suit, it appears that numerous other executions on other judgments were sued out by Crim and levied on sufficient property to satisfy them. In all these instances, the executions were returned unsatisfied by the order of Crim, and, in those cases in which property had been levied upon, it was left by his direction in the hands of Howell, the debtor, and afterwards privately sold and the proceeds applied on later judgments. None of the judgments, however, on which executions were so issued were the judgments in which it is claimed Wilmoth was surety for the debts.

The bill of George, administrator of Wilmoth, sets up the recovery by Crim of the judgment of February 4, 1893, against John Howell and Wilmoth for $324.00 and costs; the recovery of the judgment against John Howell, Wilmoth and the two Dilworths for $1,036.60 and costs, on the 22nd day of May, 1892, averring the same to have been predicated on a note made by John Howell, Wilmoth, the two Dilworths and J. E. Howell; the recovery against John Howell and Wilmoth of the judgment for $133.71 and costs, on the 18th day of February, 1892; the conveyance, by Howell, to the Browns and Gall, of the land hereinbefore mentioned and the subsequent conveyance thereof by the Browns and Gall to the Pennsylvania Coal & Mining Company, a corporation; the conveyance of the other land above mentioned by Howell to Crim and by Crim to E. H. Crim and M. Peck, and the application of the proceeds of the sale as already stated; the issuance and levying of a portion of some of the executions, mention of which has been made; and the suretyship of A. V. Wilmoth in the three debts against him and Howell and others, and notice thereof on the part of J. N. B. Crim before the rendition of the judg-

ments for said debts. It charges that the judgments, wholly
and partially released, or treated as satisfied, by Crim and
Howell, in consideration of the conveyance of the tract of
327 acres of land to the former, had all been satisfied, paid
off and discharged by reason of the issuance of the executions
aforesaid and the levying of the same upon sufficient property
to satisfy them. It prays subrogation on the part of the plain-
tiff to the benefit of the liens of said judgments upon the
lands, so alienated by Howell, and cancellation of the deeds
made to the Browns and Gall, the deeds made by them to the
Pennsylvania Coal & Mining Company, the deed made by
Howell to Crim and the deed made by J. N. B. Crim to E. H.
Crim and M. Peck, as clouds upon the title to said lands.
The bill also charges fraud on the part of Crim and Howell
and prays that these conveyances be set aside as fraudulent
and asks general relief. J. N. B. Crim answered the bill, ad-
mitting some of the allegations thereof, denying others and
apparently failing to respond in sufficient manner to still others.
Pending the suit, he died, and E. H. Crim and M. Peck, having
qualified as the executors of his will, filed another answer in
which they deny that Wilmoth was surety "for John Howell,
to their decedent J. N. B. Crim or any one else." As to
whether there was any notice of said suretyship, if it did exist,
or notice of any claim thereof on the part of Wilmoth, both
answers are silent. These answers rather attempt to set up
excuses or estoppels against Wilmoth. The first one says:
"Howell was permitted to make private sale of said property,
because it was well understood by all interested parties that
said Howell could and did make better sales of said property
than could possibly be made by the sheriff under said execu-
tions and all of said Howell's creditors recognizing that matter
to be true gave their consent to all of said transactions men-
tioned in the plaintiff's bill touching said executions, and the
proceeds of the sales of said personal property was applied to
the payment of Howell's indebtedness to the relief of himself
and all his creditors and sureties so far as said proceeds ex-
tended. It also sets up the bankruptcy proceedings and the
sale of all of Howell's other real estate therein and payment
of the proceeds thereof on his indebtedness, and says said
proceeding was equivalent to a confirmation of all that had

been done by Howell in the way of a sale of his estate in his lifetime for the payment of his debts, and that any other course than that which was pursued by Crim would have resulted in the loss of a much greater amount by Howell's creditors than was lost, and also that Wilmoth in his lifetime consented fully to said sales and that the plaintiff has no right which did not belong to said Wilmoth in his lifetime touching said matters. The second answer sets up the suit of Crim against Wilmoth and others and the suffering by Wilmoth of decrees against him therein and payment of the same by Wilmoth after Howell had received his discharge in bankruptcy, and Wilmoth's failure to make any defense in that suit and his estoppel now to demand the right of subrogation in view of his failure to set up any defense to said suit against himself.

The court entered a decree declaring liens upon the real estate of Howell, in favor of Wilmoth's administrator for the three debts set up in his bill, setting aside the deed from Howell to J. N. B. Crim and from said Crim to E. H. Crim and Peck, in so far as the same affect the liens aforesaid, and referring the cause to a commissioner to ascertain the real estate Howell owned at the time of the institution of the suit against him by Crim, liens thereon at that time, what disposition had been made of said real estate, what real estate, if any, Howell acquired by purchase after the institution of that suit, what real estate he owned at the date of the three judgments against him and Wilmoth and others, what real estate he sold or conveyed pending the suit, what real estate he owned at the time of his death, what real estate was owned by the defendant, J. E. Howell, against whom relief is prayed as a co-surety of Wilmoth, and whether the judgments mentioned in Crim's bill against John Howell and J. E. Howell are liens which have been paid and discharged, and who was principal and who surety in the judgments, what executions had been issued and whether levied upon property sufficient to pay the debts, and the annual rental of all the real estate owned by J. E. Howell. In setting aside the deeds to Crim and Crim and Peck, the decree says, "but in case it shall hereafter appear from an order of reference to be herein made that John Howell is the owner of other real estate liable to the lien

of the said judgments which have not been conveyed by him, then such real estate not so conveyed by him shall first be liable to the lien of plaintiff's judgments, and in the event there be a sufficient amount to pay the same, then this decree in so far as the same sets aside said conveyance of the said 'Bill's Creek Farm' shall be held for naught."

The first contention is that the decree is not appealable. This, we think, is untenable. It sets aside deeds and declares liens upon real estate, thereby settling the principles of the cause. What remains to be done is merely executory in character. *Wood* v. *Harmison,* 41 W. Va. 376. It is not a final decree, but it is an interlocutory decree, made appealable by the statute.

Failure to establish the relation of surety on the part of the plaintiff's decedent is strongly urged as a ground of error. One response to this charge on the part of counsel for the appellee is that the allegation of suretyship is not denied by the answers. Though somewhat informal, inartistic and general, there is a denial in the answer filed by E. H. Crim and Peak, as executors, and in their own right, which we have quoted. In the absence of an exception to it for generality and a demand for a more specific denial, we think it is sufficient. *Sandusky* v. *Farris,* 49 W. Va. 150; *Burlew* v. *Quarrier,* 16 W. Va. 108; *Richardson* v. *Donahoo,* 16 W. Va. 685; *Dent* v. *Pickens,* 59 W Va. 274. This contention being overruled, it is next urged that there is no proof of the fact of suretyship. The only oral testimony offered to establish it is that of J. E Howell and G. W. Dilworth, both of whom are parties to this suit and interested in the result thereof. They were co-sureties of the plaintiff's decedent in the judgment for $1,036.60, according to the allegations of the bill and their own testimony, and the bill seeks relief against them as such, although there is no specific prayer for such relief. The incompetency of these witnesses is obvious. Being parties to the suit and interested in the event thereof, they are within both the letter and spirit of section 23 of chapter 130 of the Code. If the plaintiff should succeed in obtaining re-imbursement out of the John Howell lands, they will be relieved from liability as co-sureties. There is documentary evidence, however, of the suretyship of Wilmoth in the judgment for $133.71. A copy of the order in which that judgment was taken was introduced in connection with the deposition of the clerk of the circuit court,

which reads in part as follows: "It is agreed that the appellee, S. L. O'Neal recover of the appellant John Howell and A. V. Wilmoth, his surety upon his appeal bond herein the sum of $133.71" &c. This judgment was either assigned to J. N. B. Crim or recovered by O'Neal for his use. As to this, there is no controversy. This judgment was rendered in accordance with the statute governing the rendition of judgments on appeal from judgments of justice's courts. The order itself is the evidence of the judgment, and, in proving the same, it proves the relation subsisting between Howell and Wilmoth. The description of Wilmoth therein, as surety in the appeal bond, is a recital of the fact in the evidence of Crim's title to his right against Wilmoth, the judgment. That order constituted the basis of Crim's demand upon him and receipt of the money, and is clearly admissible. We think it proves not only Wilmoth's suretyship for Howell in that judgment, but notice thereof to Crim as well. He was bound to notice recitals of fact in the record of his judgment. In dealing with the land as purchaser, he was bound to notice this recital. *Tanning Co.* v. *Boom* Co., 63 W. Va. 685, and authorities there cited. It was at least sufficient to put him upon inquiry. The record of the action in which his judgment had been recovered would have shown whether Wilmoth was surety in the appeal bond. It appeared in two ways, first, in his title to the judgment, second, in an incumbrance upon the land he bought.

The payment of this judgment by Wilmoth, without any assignment thereof, gave him right in a court of equity to take and exercise all the remedies and powers and rights against Howell, his principal, that had previously been vested in Crim. In other words, having paid the judgment, he could enforce the lien thereof for his benefit against the lands of Howell. 2 White & Tudor's Leading Cases 278; Brandt on Suretyship, section 341; Sheldon on Sub., section 87.

Fully cognizant of this principle, counsel for the appellee say Wilmoth's personal representative is estopped from enforcing this lien by his failure to set up in the suit, brought against him by Crim, what is said to be a release, by reason of Crim's purchase of the Bill's Creek Farm. It is argued that the purchase of this farm by the judgment creditor satisfied the liens thereon, whether its value was equal in amount to the liens in question

and all the other prior liens thereon or not: The authorities cited in support of this contention do not sustain it. All that is said in *Johnson* v. *Young,* 20 W. Va. 614, is that the purchase by the judgment creditor of the lands subject to the judgment or the purchase of judgments by the owner of the land encumbered by them, releases the surety in the judgment. The Pennsylvania case, *Koons* v. *Hartman,* 7 Watts 20, states the legal effect of the purchase by the judgment creditor of the land. In such case, there is a legal merger. The lien, as an interest in the land, is swallowed up in the ownership thereof, the larger interest, the fee-simple title, since, in law, no man can have a lien, lease or other incumbrance on his own land; but, in equity, it is otherwise. There substantial right and justice break over the lines of technicality and the lien is kept alive as a separate, distinct thing for the benefit of the party entitled thereto whenever substantial justice requires it. If a prior incumbrancer acquires the absolute title to the incumbered property his lien survives in equity to protect him against the claim of a junior incumbrancer. Nor does his purchase destroy the rights of the junior incumbrancer. For the settlement and determination of all controversies between them, they stand just as they did before the purchase. For these purposes, the two estates or interests in the purchaser are treated in equity as separate and distinct, and dealt with accordingly, unless the interests of the parties have been affected or changed by some agreement or added circumstances, introducing new equities or destroying those naturally arising out of the transaction. Sheldon on Sub., section 53 to 59; 20 A. & E. Ency. Law 595-6. An intervening estate in or charge upon the land always prevents merger. Sheldon on Sub., section 60; 20 A. & E. Enc. Law 595. 'Whether there is a payment, release or destruction of an intermediate charge or junior or senior lien is always a question to be determined by the interests, equitable rights, conduct and intention of the parties. These principles emphatically deny the claim of satisfaction of the Wilmoth judgments, predicated on the mere purchase of the Howell land by Crim.

Whether the surety was thereby released, in whole or in part, depends upon the value of the land and the amount of the subsisting prior incumbrances. If there was nothing of value

in this land, after satisfaction of the prior liens thereon in favor of Crim, he could take the land in satisfaction of such prior liens, without the slightest injury to Wilmoth, and, therefore, in perfect consonance with right and justice. "If the full value of what is primarily liable is realized upon the debt, that is all that can be asked by those interested in the other parcels." Sheldon on Sub., section 79. If the whole security has been applied by the creditor on the debt in good faith, there is nothing to which the surety can be subrogated. *Id.* section 116. A creditor has perfect right to apply securities upon his senior debts or liens to the exclusion of a surety for a junior debt, unless such securities were given especially for the junior debt. *Id.* section 117. In view of the extent of Howell's prior indebtedness to Crim. and others, it is by no means clear that 'Wilmoth could have realized anything out of the tracts of land he is seeking to subject, if they had not been sold and the proceeds applied in the manner already stated, unless releases were effected in favor of the surety by the issuance and levy of executions on prior judgments.

These executions were not on the Wilmoth judgments. The personal property on which liens were acquired by these executions never was in any way subjected to any lien for the Wilmoth debts. For the satisfaction of these debts, it never was in Crim's hands or under his control, however effectually he may have had it in his power for appropriation to the satisfaction of other debts, and however ample it may have been to pay them. In releasing his lien upon it, or diverting the proceeds thereof to other debts of later date and not so well secured, Crim may have obtained large advantages, but it is clear that he took nothing from Wilmoth nor released or misappropriated anything upon which the 'Wilmoth judgments were in any sense or in any degree liens. Whatever may have come into Crim's hands in this way, or however irregularly he may have obtained it, there is no evidence that he received it either for payment of, or as security for, the judgments in which Wilmoth was surety, and he could, consistently with all the duty he owed Wilmoth in respect to these debts, pursue his remedies against Howell for his other debts, and, if Howell waived irregularities, or voluntarily paid these other judgments or surrendered property in satisfaction of them, on

which the Wilmoth judgments were not liens, it cannot be said this worked a release in favor of the surety. Nor can it be said any fraud was thus perpetrated upon the surety, for, in this way, Crim was merely preferred as a creditor. The creation of a mere preference does not constitute fraud. Our conclusion, therefore, is that, in the present state of the evidence, a release of Wilmoth as surety is not established. Being of this opinion, we do not enter upon any inquiry as to whether Crim, after having collected from the surety, is precluded from setting up a release, so effected.

What is the status of E. H. Crim and M. Peck, to whom J. N. B. Crim conveyed the land? They are admittedly volunteers. The conveyance to them was a gift of the land. The suretyship of Wilmoth in the judgment for $133.71 was a recital in the chain of title. Hence they took the land with notice of it and gave nothing of value. Wilmoth's claim was not then a debt in the ordinary sense of the term, but it was an equity in respect to the land, disclosed by the title papers, in view of which it is impossible to say Crim and Peck are protected as innocent purchasers. In a sense they are purchasers, and, if the Wilmoth demand were against J. N. B. Crim and an ordinary debt, he being solvent and amply able to make the conveyance without detriment to his creditors, they would be protected. But as we have said, it was an equity in respect to the land, conveyed to them, of which they were apprised by the recorded papers, pertaining to the title, so that they cannot be regarded as innocent purchasers, even if they had purchased for value. They are therefore, in no better situation than their donor.

The bankruptcy proceeding is relied upon as precluding relief in this suit. The record of that proceeding shows no express discharge of the bankrupt, but, if it did, such discharge would only relieve the debtor from further personal liability. Moreover, it does not show that the land conveyed to the Browns and Gall and Crim were in any way involved in it. They were neither sold therein nor the previous sales thereof confirmed by any order or decree made. Whatever may be the effect of the failure of the record of that proceeding to disclose these matters, it is certain the bankruptcy of a debtor and his discharge do not destroy any security a creditor may have for his

debt. National Bankruptcy Act, section 57. The debt of Wilmoth was not proved in the bankruptcy proceedings, nor was his security therefor administered and applied therein.

The last defense relied upon is laches. The right of subrogation accrued October 29, 1899, when Wilmoth paid off the judgments. This suit was brought early in January, 1904, less than five years after the accrual thereof If the statute of limitations applies, in such cases, the time is too short. If it does, not, and the equity principle of laches alone governs, we see nothing, in the circumstances of the case, calling for the application thereof. The lapse of time is not great, and, although Crim, Howell and Wilmoth are all dead, the evidence is chiefly documentary. The case is not dependent, to any considerable extent, upon oral evidence, lost by the death of witnesses and parties. The records in *Crim* v. *Howell* and the other suits probably preserve and disclose, in documents and admissions, all that any of them could say, if they were still living. Nor have any new rights vested since the accrual of the cause of action.

*Prima facie,* there is a lien upon, and right to proceed against, the alienated land, in respect to the one judgment for $133.71, but none as to the other two, set up in plaintiff's bill. This one lien, however, cannot take precedence over the prior liens on the property held by Crim and others. It must take its place in the regular order of priority. In equity, all of the prior Crim judgments and all others on the Howell land, not paid or released, must be regarded as alive and subsisting for the purposes of the settlement of the controversy between Wilmoth and the owners of the Howell land, just as effectually as if the title thereto were still in John Howell. The court erred, therefore, in declaring the lien for $133.71 to be a lien upon these lands, to the exclusion of other liens thereon, and treating it and the other two claims set up in the bill, as the only liens thereon. It further erred in declaring the liens for $324.00 and $1,036.60 as still subsisting in favor of the plaintiff, there being no proof that Wilmoth was surety for these debts, nor of any notice to Crim that he claimed any equity as surety in respect to them. It further erred in setting aside the deeds from John Howell to J. N. B. Crim, and from said Crim to E. H. Crim and M. Peck. So far, these deeds do not appear to be

void for any reason. Howell's title had not been divested by any sale. He could convey the legal title, notwithstanding the pendency of the suit, but the purchaser took the land with the burden of the lien thereon. A lien is not legal title to land. It is a mere incumbrance or burden on the land. Nor is there any proof of fraud in Crim's purchase of the Bill's Creek Farm, invalidating the deed. A reference, however, was proper. A large portion of the prior Crim debts had been settled or satisfied in various ways, some out of the land and minerals, conveyed to the Browns and Gall, some out of the proceeds of the personal property and by payment, some by the conveyance of the Bill's Creek Farm to Crim, and others out of the lands sold in the bankruptcy proceeding. It may appear on the ascertainment of all the facts, relating to the liens on the property, that the plaintiff is entitled to some relief and it may not; but the lien to which he asks to be subrogated is a legal right, and, *prima facie*, a charge upon the land, and proof of plaintiff's equity, his right of subrogation as surety, respecting the same, justifies the reference to a commissioner to ascertain the status thereof, just as in the case of any other lien.

For the reasons stated, the decree will be affirmed in so far as it declares a lien in favor of the plaintiff for the judgment for $133.71, costs and interest, and refers the cause to a commissioner to take, state and report an account, and so far only; and, in all other respects and in every other particular, the same is reversed and the cause will be remanded to the circuit court of Barbour county for further proceedings in accordance with the principles and conclusions herein stated, and further according to the principles and rules governing courts of equity.

*Affirmed in part. Reversed in part. Remanded.*